E-FILED
Thursday, 29 June, 2017 09:20:11 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

MORRIS TYSON, )
Plaintiff, )
vs. ) No.
KENCO LOGISTIC SERVICES, ) 15-cv-2288-CSB-EIL
et al., )
Defendants. )

The deposition of MORRIS TYSON, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jacqueline Shenberger, Certified Shorthand Reporter within and for the County of Cook and State of Illinois, at 150 North Michigan Avenue, Illinois, on May 17, 2017, at the hour of 9:32 A.M.

Jacqueline Shenberger
License No: 084-001524

Page 34

you write it?
A. A lot of this -- it was typed, but I mean, a lot of this drafting and words, yes, I did get from other people, yes, I did. But I can't say if the other person that gave me the same information gave it to Henry, you know, that part I don't know.
Q. Right. So again, I'm not talking about the information that you got from the different sources --
A. You're talking about the typing part?
Q. I'm talking about the fact that there are identical allegations in your Complaint as well as Mr. Henry's?
A. Right. Somebody else that I talked to could have gave him the exact information that I may have got the information from. As far as words and stuff, yes.
Q. So you don't know though, you didn't have a conversation with Vernon Henry about --
A. Not to say exactly the same words like that, no, I did not give him that information.
Q. What information, if any, did you give Vernon Henry for his Complaint?

Page 35

A. Anything that he may have read out of my depositions and paperwork.
Q. Okay. And what kind of information did Miss Madison give to you relative to your Complaint?
A. Actually, Miss Madison helped me with the attorney that gave me some information.
Q. Can you be more specific, please?
A. Mr. Jordan Hoffman.
Q. Okay. Now, Jordan Hoffman is not representing you, is that correct, in this lawsuit?
A. No, not on an official capacity, no.
Q. Okay. And when you say not official, is he representing you in an unofficial capacity?
A. I can receive information from him due to the fact that I know him.
Q. Okay. And so what conversations, if any, did you have with Jordan Hoffman regarding your Amended Complaint?
A. He directed me to the -- a lot of the websites and information on how I should -- where I could find the information, yes.

Page 36

Q. Okay. And did he review your Complaint before you filed it?
A. No, he didn't.
Q. Did you review any of the allegations in your Complaint at any time?
A. Did I review them?
Q. Did he, did Mr. Hoffman?
A. Oh, no.
Q. So you've never showed Mr. Hoffman your Complaint?
A. No, he just gave me advice.
Q. What kind of advice did he give you?
A. I asked the question if this is good enough to put into the deposition, so anything.
Q. How often are you in touch with Mr. Hoffman?
A. We have e-mails together.
Q. I can't hear you?
A. We have e-mail together, we're actually friends on Face Book.
Q. And so have you e-mailed with Mr. Hoffman about your lawsuit?
A. Yes, I have.
Q. Have you produced those e-mails?

Page 37

A. Can I produce them?
Q. I asked have you produced them?
A. I believe I have.
Q. Okay. I don't have them and so I would request that you produce every e-mail that you have with Mr. Hoffman regarding your lawsuit. Okay?
A. Okay. I'll have to figure out how to do that. I don't keep a whole log of e-mails. I'm not that type of person.
Q. Right. You have e-mail, is that correct?
A. Yes.
Q. And so you can just search and put Jordan Hoffman and then all the e-mails from Jordan Hoffman will come up.
A. Okay.
Q. Okay. And who else do you e-mail with about your lawsuit? Are you e-mailing with Edith McCurry?
A. No.
Q. Are you e-mailing with Len?
A. No.
Q. Are you e-mailing with Mary Madison?

Page 250

Q. Okay. So Jordan was giving you advice on how to answer the discovery responses?
A. Or anything, yes.
Q. Or how to answer any motion that we filed?
A. Yes.
Q. Or whether you should file a motion?
A. Yes.
Q. Okay. And so you would consult with him on a regular basis when things would happen in this lawsuit?
A. I wouldn't say regular. It all depends if I didn't know how -- if I figured I needed a question about something.
Q. Okay. And so from time to time you would reach out to Jordan and he would give you advice on how to address whatever question you posted?
A. He would answer some of my questions, some he beat around the bush, tell me I should be able to figure it out, you know.
Q. Okay. Some questions he would answer, and some questions he said you go figure it out?
A. Yes.

Page 251

Q. All right. And so when you had all these documents that you were going to produce to the Defendants, how did you produce them? Did you just produce them by yourself, did you and your daughter get together and organize them, did you give them to Edith? How did you produce them?
A. Well, I sat up there and we put them together in a form at first.
Q. I'm sorry.
A. I put them together all of them, in a form and then I did speak to Jordan about how should I put them 1, 2, 3 or 1, 2 4. That.
Q. And?
A. And he told me just make it make sense, to put stuff like, you know, in certain orders.
Q. Does Madison work with Jordan Hoffman, to your knowledge.
A. They're friends. I was introduced to him by her.
Q. Okay. And does she work for him at all in any capacity, to your knowledge?
A. That part I don't know.
Q. Okay. All you know is that they are

Page 252

friends?
A. Yes.
Q. Okay. So just going back, when you got all the documents together, you reached out to Jordan, asked him some questions in terms of how to produce it and then what did you do?
A. That's when I started trying to put it together.
Q. Okay. And then when you put it all together, what did you do?
A. I asked him again does this sound right, you know.
Q. So you asked him to look over what you were producing?
A. Well, I would tell him when I got in forms, you know, in order.
Q. And then what was it --
A. Because a lot of times, I didn't run up to his place or nothing like that.
Q. No, but you were communicating with him by phone?
A. Yes.
Q. By e-mail, you mentioned earlier you had e-mails?

Page 253

A. Yes.
Q. Okay. And so how did you then after you conferred with him and you organized it, how did you produce it so that you had copies of what you produced, how did you produce it?
A. What you mean? Give it to you?
Q. Well, there's a lot of copies here, right?
A. Yes.
Q. So --
A. I have a lot of paper, a lot of it came, like I say, I ordered this stuff right downtown, right here, downtown, they got a place where you can order tons of documents from companies, and I paid close to $300 for all this paperwork I got, yes, I did.
Q. So making copies or --
A. They sent the whole this when I asked for stuff on KENCO, I got a whole box of stuff.
Q. When you asked for stuff from whom?
A. Anybody. I mean, it's like my personnel files that you all sent me, you go down there, you got places where you ask for stuff that you can get it, you get the whole

Page 262

A. Which health clinic?
Q. It's right above the True Screen.
A. That's just short for -- that's the St. Mary's Employment Clinic, where they send you to take tests, sent to St. Mary's.
Q. So what did you go to St. Mary's for?
A. Employee test, take your drug test, physicals, pre-employment, anything like that.
Q. This is where you got your drug test?
A. And DOT.
Q. And DOT. Okay. T and U. Where did you come up with that language?
A. Where? At St. Mary?
Q. You say other individuals identified by Defendant included, but not limited to individuals who may be listed in any of the documents identified in Defendant's disclosures or response to Rule 26 (a)1 (a) 2 below. And other individuals otherwise identified in discovery in this action, including in depositions and responses to discovery requests to parties and responses to third party discovery requests may have discoverable information that Tyson may use to support his

Page 263

claims. Who drafted that?
A. That could have been a draft I got from Jordan.
Q. Okay. Same thing for number U or letter U, Tyson also reserves the right to call record keeper or witnesses to establish a foundation, authenticity or otherwise establish the admissibility of other documents. Who drafted that?
A. I put it on the paper, I was told that.
Q. Well, who told you to put that there?
A. Jordan did.
Q. Okay. Then on page 5, it refers to documents. Okay. Where did you get this list of documents from? This list of documents goes from page 5 through half of page 7?
A. A lot of these documents is public knowledge. I believe I got them in one of the boxes that I have.
Q. Okay. So my question is --
A. Some of them are mine, some are the employment that I had, documents.
Q. Okay. Who put this list together? Who did this, these bullets, this list, who

Page 264

organized this?
A. The question is you want to know if the lawyer is helping me, right?
Q. Anybody, whoever --
A. I mean, yes.
Q. I don't know, whoever it is that's helping you?
A. When I put it together, I was just told how to do it?
Q. Right. Who told you how to do that?
A. Jordan.
Q. Okay. Defendant's directory, what's that?
A. Defendant's directory?
Q. Right, wondering what it is?
A. It sounds like my phone number.
Q. So you don't know what that is, Defendant's directory, as you sit here today?
A. No.
Q. And your phone records, what phone records are relevant to this case?
A. I have none at this time.
Q. You don't have any phone records?
A. No, but I would say if I had to I could

Page 265

probably produce them, but I didn't -- I would have to put in a subpoena to the phone company to get them.
Q. What documents from Marty Ringo's IDHR file that you have that's relevant to your case?
A. Me and Marty shared information all the time about what was going on with him. And it was like we was both being (inaudible) that's what we came across. We were being discriminated against.
Q. And so what documents from Marty Ringo's IDHR file are relevant to your lawsuit?
A. The same as when he had accidents, he would get suspended.
Q. Okay. And so what documents do you have from Marty Ringo's IDHR file that represents --
A. None now, he has his own.
Q. Well, you have here, this is a list here --
A. I don't believe I turned it in though.
Q. Pardon?
A. I don't believe that was turned in. I saw the document, but I don't believe I have it

Page 270

they do you wrong.
Q. Who else? Who are the others? You need to list the others?
A. It's no others.
Q. Okay. So there are no others, we can take and others off of your Rule 26 Disclosures to make it more accurate, is that fair?
A. Yes, the only other I told you about was Terrence Linsey, and you know, people like that, but there's nothing they can verify on why I was let go or treated the way I was.
Q. Well, you were let go because KENCO --
A. I mean, the way I was treated.
Q. Okay. Just wanted to be clear on that. You were let go with everybody else because KENCO lost the contract, right?
A. Yes.
Q. Okay. So there's no issue about why you were let go?
A. No.
Q. No. And so you have -- what you're saying is you got e-mails, written correspondence affidavits and logs from McCurry, Szplett, Ringo and Cates, right?

Page 271

A. Yes.
Q. Okay. And nobody else?
A. Nobody else.
Q. Okay. And so we'll check and see what we have and if not then you'll need to produce those documents, okay. What is the LinkedIn profile for Jay Elliott have to do with your lawsuit?
A. Because I always was curious on what his -- because he's the one that talked to me the first time I put in something. And he didn't know exactly what was going on with the company.
Q. Jay Elliott?
A. Hmm, hmm.
Q. Who's he?
A. Who is he?
Q. I'm asking you?
A. I don't know.
Q. You don't know who he is?
A. Hmm, hmm.
Q. Okay. Then you've got LinkedIn profiles Tammy Fawler, Laurie Barbel, Seva Leesie, these are the things that were produced

Page 272

that we talked about before?
A. Yes.
Q. Okay. 49CFR, what's that?
A. I have no idea right now. It was something that was told to put down there.
Q. Okay. And you were told to put down that by who?
A. Jordan Hoffman.
Q. And 29CFR? Same?
A. 21.
Q. 21CFR?
A. Yes.
Q. Okay. Do you know --
A. It's some kind of documents, I actually believe I got copies of them, I just don't remember what they are right now.
Q. Okay. And FSMA, what does that stand for?
A. Oh. I don't -- it stands for -- it's a document that the company gives us.
Q. Okay. What does that have to do with your lawsuit?
A. Actually, it had to do with the policies, some of their policies, what's in it,

Page 273

on how they suppose to treat the employees. But other than the lawsuit, nothing.
Q. Okay. And Jordan told you to put in the Bioterrorism Act of 2002?
A. Yes.
Q. And what is that Bioterrorism, I'm not familiar with it, what is that?
A. It's just the procedure that we had at the company.
Q. The Bioterrorism Act?
A. We had Homeland Security Cameras in that building.
Q. And what does that have to do with your employment? I should say, what does that have to do with your lawsuit, your claims?
A. Nothing.
Q. The Bioterrorism Act has nothing to do with your claims?
A. No.
Q. Any reason why you put it down other than the fact that Jordan told you to do it?
A. Other than, if we could access the cameras sometime. But I told them I doubt we can do that.

Page 294

A. I don't know where I got that.
Q. Who's Eddie?
A. Eddie was another warehouse worker.
Q. Okay. Somebody else who was unhappy at KENCO?
A. I believe so, yes.
Q. Okay. And Jason Pendelton?
A. I don't have that list in front of me. I got all their names, everybody in there was a KENCO associate.
Q. Okay. But what do they have to do with your lawsuit? You're basically naming everybody who worked there --
A. It's just showing that it was more than just me having problems there at KENCO.
Q. I see. Okay. And Jason Pendelton had problems as well?
A. Yes.
Q. And he told you about those?
A. Yes.
Q. Yeah. Trace Spier, S-p-i-e-r?
A. You're saying that almost right, it's a weird name.
Q. What does that person have to do with

Page 295

your lawsuit?
A. Nothing.
Q. Okay. Maria Juarez?
A. Maria Juarez was another and don't have nothing to do with my lawsuit, just people with problems with KENCO.
Q. Okay. Judy Craig?
A. She was office personnel that knew what I done.
Q. I'm sorry, she was office personnel that knew?
A. The jobs that I did.
Q. Okay. Any other relationship to this lawsuit?
A. Other than she knew that I was able to do the window work, shipping and receiving.
Q. Okay. Anything else?
A. No.
Q. Mike DeGiraloma?
A. DeGiraloma?
Q. D-e-G-i-r-a-l-o-m-a?
A. Right. That's another unsatisfied employee.
Q. Uh-huh. What's his race?

Page 296

A. I believe Spanish.
Q. But you don't know?
A. No.
Q. LaShon Myle Kyle? What does that person have to do with your lawsuit?
A. Nothing.
Q. Okay. Gayle G-a-y-l-e, Lea, L-e-a?
A. Yeah, nothing.
Q. Okay. Matt Inyart, I-n-y-a-r-t, Inyart?
A. No, nothing.
Q. Doesn't have anything to do with your lawsuit?
A. Not with my lawsuit.
Q. Okay. Melissa Hanson?
A. Knew exactly what I used to, but really it's nothing to do with the lawsuit, if I don't have her as a witness.
Q. What is it, Fabi I-l-e-s?
A. Nothing.
VIDEOGRAPHER: Excuse me, Counsel, I should end this tape now.
The time is 4:14 PM. This is the end of tape 3 and we're going off the video record.

Page 297

(Whereupon, a short break was taken.)
VIDEOGRAPHER: The time is 4:24 PM. This is the beginning of tape 4. We are back on the video record.
BY MS. MORAN:
Q. Mr. Tyson, what is root cause analysis?
A. Another word for reason.
Q. Pardon?
A. I felt like it was another word for reason.
Q. Okay. So let me read to you the sentence where it comes up. You have -- you served Kelvin Walsh with production requests and you asked for any e-mails, mailings, written correspondence of any kind, facsimiles, logs, quality management system, required documentation, incident reports, corrective and preventative action reports, root cause analysis, OSHA and safety laws, quality coordinator, monthly report and the like regarding the investigation that a workplace infraction by any of the aforementioned persons or other persons involved in said investigations

Page 298

relative to any portion of the investigation from the root cause analysis and final disposition of the corrected and preventative actions, as well as e-mails from Tyson or on behalf of Tyson to any of the aforementioned persons or entities.

So what is it? What's the root cause analysis?

A. I have no idea.

Q. Okay. And you didn't draft that, did you?

A. No.

Q. Okay. Who did?

A. Jordan. I did know what root mean, but I don't have the right definition.

Q. Okay. And so you -- of these 227 requests for production that you served on Defendant Walsh, how much of this was prepared by Jordan?

A. I got some -- a lot ideas from this. Some of it I have in my own file, actually the documents and stuff I've got already. Some of the ISA (phonetic) documents that were sent to me.

Page 299

Q. Really my question now is more specific, which is how much of the production request to Defendant Walsh did you draft and how much of it was drafted by Jordan Hoffman?

A. I came up with the idea, he showed me -- told me how to draft it.

Q. You came up with what idea?

A. That I needed some other evidence, other stuff on Kelvin, he gave me an idea.

Q. Okay. And so how much of this was drafted by Jordan of the 227 requests?

A. What you mean drafted, wrote by him.

Q. Yeah, how much of it was created, put together, yes, how much?

A. None of it, I gave him the idea, he told me how to put it together.

Q. How did he tell you how to put it together?

A. To make it look legally, for you to understand it.

Q. My question is the method, how did he communicate to you what to put in the production request to Defendant Walsh?

A. Over the phone.

Page 300

Q. Okay. And so it's your testimony then that over the phone Jordan Hoffman gave you requests, he dictated them to you over the phone, is that your testimony?

A. Some of it.

Q. Okay. And then others of it?

A. Some of it I already had.

Q. Okay. From where?

A. Shipped to me from you. I mean, documents I got in a case. I don't know.

Q. Again, I'm sorry if I'm not being clear. I'm asking about the request itself, I'm not asking about the documents. I'm asking about you served Defendant Walsh with a production request, 227 requests. And I'm asking who put this together? How was this put together?

A. I just told you, Jordan.

Q. Okay. Is there anybody else -- and is it your testimony that Jordan, for example, put together -- did you or Jordan put this together? You want documents relating to any and all comparable persons, including temporary and permanent employees subjected to being denied

Page 301

the opportunity to exercise their protected rights as well as the enforcement of policy after any violation of public and company policy but not limited to the date, time, name, contact information, title, position policy effectuated to facilitate this decision, the decision makers and the exception form in business cases applicable as well to terms and conditions imposed. Is that you?

A. No, that's him.

Q. That's him. And he read that to you over the phone?

A. He read that, my phone has a recorder.

Q. Okay. So that's what you did, you recorded what he said?

A. And then I have it typed down.

Q. Okay.

A. Some of the words --

Q. Yeah. Do you still have the recording?

A. No, I can't keep all that in here.

Q. Okay. How long was that conversation?

A. It could have been hours or so that we talked.

Q. You talked for hours?

Page 302

A. We talk for hours sometimes.
Q. Putting together just the production request?
A. That one we could have, yes.
Q. Okay.
A. There's a lot of talking --
Q. Yeah. Approximately how many hours would you say you have spent talking about your lawsuit and getting advice from Jordan Hoffman on this lawsuit? Forgetting about what happened at the Illinois Department of Human Rights, I'm just talking from the time that you filed your complaint, about how much -- how many hours would you say you spent with Jordan Hoffman with him giving you advice on this case?
A. I don't know.
Q. Give me your best guess, rough estimate?
A. Because all the time we talk we're not talking about the case.
Q. I'm talking about the time you're talking about the case, about how much time would you say you have spent with Jordan Hoffman where you have sought his advice and he's given

Page 303

you advice on this case?
A. Five or six hours, I don't know.
Q. Just five or six hours?
A. At a time, I mean.
Q. Oh, at a time? Five or six hours at a time?
A. I mean, could have been, some of these papers took me a couple of days, two or three days to put together. If I didn't know what was going on, I would call him. I don't know times, how long every time we talked.
Q. Ah-hah. So is it fair to say that you spent forty hours talking to Jordan about this case? A weeks worth of time, throughout the life of your lawsuit?
A. Could have.
Q. Could be more, could be less?
A. Could be more or less.
Q. Okay. What is the reason why you haven't retained him to represent you on this case? He was representing you at the Illinois Department of Human Rights, correct?
A. Yes.
Q. Yeah.

Page 304

A. It's a possibility if I needed him I told him I still have him retained. He's kind of -- I don't have the money to retain him like that. But by us being friends, like we've had dinner a couple of times, I mean.
Q. So Jordan is not only a good friend of Mary Madison, he's also a friend of your's?
A. Yeah, I was introduced to him, we became friends. I told you we Face Book friends, we're friends.
Q. And so the questions about Defendants umbrella insurance policy. Is that from you or is that from him?
A. No, that's the insurance policy that didn't cover none of my medical. I brought it to his attention. Then when we first got KENCO that they -- that they promised me insurance and they didn't pay nothing from day one and we supposed to have insurance, it was Umbrella Insurance they called it.
Q. Have you been involved in any other lawsuits besides the one against KENCO and the other Defendants, Co-Defendants?
A. No.

Page 305

Q. This is your only lawsuit, is that correct? Do you have a lawsuit against Exel.
A. Yes, I do.
Q. Okay. And where is that pending?
A. Wrongful termination. It's not pending nothing yet, I just filed a climb, so it's not a lawsuit.
Q. So you filed a charge --
A. Because I had to because I had to go back on disability.
Q. Okay.
A. And disability told me to go downtown Chicago and file a wrongful termination charge again them.
Q. Okay. Where did you file that?
A. Right down here at the Illinois State Building.
Q. The Illinois Department of Human Rights?
A. Yes.
Q. Okay. What's your current address?
A. 547 Regent Road, University Park.
Q. And who lives with you there?
A. My wife and family.

Page 306

COURT REPORTER: Did you say Regent?
A. R-e-g-e-n-t.
BY MORAN:
Q. And who else besides your wife lives with you there?
A. My daughter. For the time being.
Q. Okay. Is that the same daughter --
A. Teri Tyson.
Q. Okay. But at the time you had the accident was she living in a different place? When you were attacked or was that your house?
A. I'm trying to figure was she still in school? She always live with us, but she's been away at college.
Q. So the place where you were attacked, whose house was that, when you said you were sitting out on the porch and then you were attacked, was that at your house?
A. No, not officially my house, but it's my daughter's, my daughter.
Q. Okay. So your daughter had a different house then?
A. Not that daughter. I have three daughters.

Page 307

Q. Okay. So what's your daughter's name?
A. Well, my other daughter --
Q. It wasn't Teri, right?
A. Yes.
Q. Okay.
A. The other was Delfina, D-e-l-f-i-n-a.
Q. And the third?
A. LaShonda.
Q. Okay. So when you had the accident you were at your daughter Teri's house, is that --
A. Yes. No, Delfina's house.
Q. Or you were at Delfina's house?
A. Hmm, hmm.
Q. Okay. And your daughter Teri lives with you?
A. Yes.
Q. And she's the one that is involved in helping type up and get things together?
A. Yes.
Q. Are your other daughters involved at all with your lawsuit?
A. No.
Q. Okay. And so you're married?
A. Yes.

Page 308

Q. Have you ever served in the military?
A. Yes.
Q. Okay. And what years did you serve?
A. 1975 to 1980.
Q. Okay. And in what branch?
A. Marine Corp.
Q. Okay. And you had an honorable discharge?
A. Yes.
Q. Have you ever been convicted of a crime?
A. No.
Q. Okay. And your highest level of education, I think you mentioned earlier that's high school.
A. Yes, I have other outside training.
Q. Okay. And what is that in?
A. I'm a tool and die apprentice. Plus I have my CDL training.
Q. And did you have -- was Jordan Hoffman your attorney for the bankruptcy proceeding?
A. No.
Q. Was that a different attorney or --
A. No, I just went through a regular

Page 309

bankruptcy lawyer.
MS. MORAN: Off the record.
VIDEOGRAPHER: The time is 4:37 PM and we're going off the video record.
(Whereupon, a discussion was had off the record.)
VIDEOGRAPHER: The time is 4:41 PM and we're back on the video record.
BY MS. MORAN:
Q. Mr. Tyson, I think I may have asked you this, but I just want to double check. How are your wrists now?
A. This one is permanent, I can't make a fist.
Q. Okay. So you have fist problems.
A. And I don't turn, I have a rod in me like -- this one also has a rod, but I'm dominant right handed. So this was able to get me my job back.
(Whereupon, Deposition Exhibit No. 37 was marked for identification.)
BY MS. MORAN:
Q. Mr. Tyson, you're looking at Deposition

Page 314

job, we could have discussed another position. But I never was even tested for the spotters job, so they don't know if I could have done it or not.

Q. Okay. So it's really that six month period that is bothersome to you?

A. It was more bothersome then, yes.

MS. MORAN: Okay. That's all I have.

MR. DAVIES: Mr. Tyson, as we discussed off the record I have a whole series of questions to ask you as well. I gave you the option of continuing this evening or setting another date, you chose to set another date and we agreed upon Thursday, June 1 at 11 AM, here at the offices of Jackson Lewis in Chicago, correct?

MR. TYSON: Yes, sounds good.

MR. DAVIES: I don't intend to send you a notice of a deposition for it, it's just a continuation of this deposition, but those are the agreements, correct?

MR. TYSON: Yes.

COURT REPORTER: Jodi, do you want the transcript?

MS. MORAN: Yes, please.

Page 315

COURT REPORTER: Mr. Davies?

MR. DAVIES: Yes.

MS. MORAN: I just want to explain one thing to Mr. Tyson, just in terms of protocol. So what happens, Mr. Tyson, because you said you haven't had a deposition before. So what happens is that all of the questions and answers are actually put together in a booklet.

MR. TYSON: Yes.

MS. MORAN: And I don't know, maybe you seen it before, but basically goes question, answer question, answer. And you have the right, if you would like once the court reporter has actually put it together in a booklet, you can review that if you want before it's final, see if there's any typographical errors or spelling errors or other kinds of errors that you think. Or you can just waive that and your deposition will just be what it is. It's up to you.

MR. TYSON: Do I get the copy of the deposition? Where do the deposition go?

MS. MORAN: If you want a copy of the deposition you can certainly get one, but you have to buy it.

Page 316

MR. TYSON: I understand. I didn't know -- okay. You're asking me to look at it for corrections?

MS. MORAN: No, I'm not asking you to do anything. What I'm telling you is that that's the option that you have. I'm not asking you for anything?

MR. TYSON: Oh, I understand.

MS. MORAN: And so I'm just saying is you would have an opportunity to go down to the court reporter'S office and take a look and read through your deposition. And then there's a form that you can fill out, where you say, you know what, on page 47, it should have been Mary instead of Julia, whatever. I mean, I don't know. Whatever it is that you think, you have that option to do that or you can waive it and say no, you know, whatever it is, it is. It's up to you.

MR. TYSON: Okay. All right. Do I have to get an answer now? Okay. If I waiver it, I still have a right to come down and look at it? I mean, I mean, I'm hoping everything is right in here. But I don't want to waiver it and then

Page 317

say oh, where did this come from.

COURT REPORTER: You can come down to my office and read it, it's going to be close to 300 pages, so you can't take it, you can waive it, reserve it, whatever you want to do.

MR. TYSON: I'll waiver it.

MS. MORAN: Okay. Thank you.

VIDEOGRAPHER: Okay. The time is 4:51 PM. This is the end of tape 4. It's also the end of Volume 1 of the deposition of Mr. Morris Tyson. And we're going off the video record.

(Proceedings concluded at 4:51)

STATE OF ILLINOIS )
) SS:
COUNTY OF COOK )

I, Jacqueline Shenberger, Certified Shorthand Reporter within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to-wit, on May 17, 2017, personally appeared before me, at 150 North Michigan Avenue, Chicago, Illinois, MORRIS TYSON, in a cause now pending and undetermined in the United States District Court, Central District of Illinois, Urbana Division, wherein MORRIS TYSON is the Plaintiff, and KENCO LOGISTIC SERVICES, et al., are the Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 31st of May, 2017.

Jacqueline Shenberger

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MORRIS TYSON, )
Plaintiff, )
vs. ) No.
KENCO LOGISTIC SERVICES, ) 15-cv-2288-CSB-EIL
et-al, )
Defendants. )

The deposition of MORRIS TYSON, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jacqueline Shenberger, Certified Shorthand Reporter within and for the County of Cook and State of Illinois, at 150 North Michigan Avenue, Illinois, on June 1, 2017, at the hour of 11:15 AM

Jacqueline Shenberger
License No: 084-001524

Page 361

Q. Why did he tell you to use his address for Miss McCurry?
A. Because I believe she signed the document like I done with him. But I don't actually know.
Q. Again, that was some sort of letter describing the scope of representation?
A. Yes.
Q. And then even on page 4 for your wife, your wife is care of attorney Jordan Hoffman, is that again Mr. Hoffman's suggestion?
A. He told me to do that just in case somebody try to subpoena her for something, that she would have representation, yes.
Q. Okay. So does your wife have a letter of representation with Mr. Hoffman?
A. No, it's an agreement that I had with him if somebody was to try to question her, that she had the right to talk to him about it before anything else, if she had to call an attorney, she could call him.
Q. Okay. But he advised you to put his address for her so that any subpoenas would have to come do him?

Page 362

A. Yes.
Q. In this document you also listed quite a few different KENCO employees. And just looking over, getting on page 2, Suzanne Moore Cathy Phillips, Mark Baker, Tom Leach, John Montgomery, Brenda Ross, William Swaren, Calvin Walsh, Mike Manzello, David Jabaley, Mario Lopez. You didn't list Mr. Coffee. Was that intentional?
A. List of KENCO employees. I just -- yes, it was intentional. I didn't put him into this.
Q. Because you didn't think he had information that was relevant?
A. I don't know if I say it's not irrelevant. I mean, he knows what was going on, it was just that he didn't have a direct effect on this.
Q. Now, in your deposition, the first part of your deposition on May 17, Miss Moran spent quite a bit of time going over your various allegations relating to disability, relating to race, etcetera. With respect to the race discrimination issue; is there anything that you

Page 363

would add to that so that -- or is that where you feel complete in terms of your information, what you view as race discrimination?
A. It's nothing that I would add, it's just the way I felt.
Q. And it had to do with things such as what you viewed as Mr. Walsh's attitude towards and you thought that was based on your race, correct?
A. Yes.
Q. Did Mr. Coffee ever give you any reason to believe that he looked down upon you because of your race?
A. No.
Q. And then she also spent a good bit of time talking to you about your conspiracy allegations, which in the Complaint is just kind of very general. So she asked you a lot to figure out what the conspiracy was about. And you talked at some length about that. You don't believe that Mr. Coffee was part of that conspiracy, do you?
A. No, I don't believe he was part of that conspiracy. I spoke to him about it, but I

Page 364

don't think he saw it.
Q. And that conspiracy had to do primarily with the actions that were taken to keep you from getting back to your job?
A. No, it was actions that went on after I filed my first initial Complaint downtown.
Q. And that included what happened after you had your accident with the mirror, the drug test?
A. I had filed a complaint before then and that's when everything else -- that's when everything started to changing.
Q. I just saw a note here, I know during the last deposition Miss Moran asked you for copies of any correspondence, e-mails with Mr. Hoffman, have you produced any of that to them yet?
A. I have no business e-mails.
Q. So you had testified that he had actually e-mailed you one of the pleadings that you filed. You don't have a copy of that e-mail?
A. No.
Q. Okay. Mr. Tyson, you've mentioned to

STATE OF ILLINOIS )
) SS:
COUNTY OF COOK )

I, Jacqueline Shenberger, Certified Shorthand Reporter within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to-wit, on June 1, 2017, personally appeared before me, at 150 North Michigan Avenue, Chicago, Illinois, MORRIS TYSON, in a cause now pending and undetermined in the United States District Court, Northern District of Illinois, Urbana Division, wherein MORRIS TYSON is the Plaintiff, and KENCO LOGISTIC SERVICES, et-al is the Defendant.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 16th of June, 2017.

Jacqueline Shenberger