**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| **MORRIS TYSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 15-CV-2288** |
| | ) | |
| **KENCO LOGISTICS SERVICES, MARS** | ) | |
| **INC., KELVIN WALSH, MIKE** | ) | |
| **MANZELLO, DAVID JABALEY, and** | ) | |
| **MARIO LOPEZ,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Defendants' Kenco Logistics Services, Mike Manzello, David Jabaley, Kelvin Walsh, and Mario Lopez filed their Motion for Summary Judgment (#104) on June 30, 2017. Defendant Mars, Inc. filed its own Motion for Summary Judgment (#103) on the same day. *Pro se* Plaintiff Morris Tyson filed his Response (#108) on July 21, 2017. Defendants' Reply (#109) was filed August 2, 2017. For the following reasons, Defendants' Motions for Summary Judgment (#103, 104) are GRANTED in full.

BACKGROUND

Before the court recounts the background facts, it must first address what facts exactly constitute the "undisputed material facts" in this case, as presented in Defendants' motions for summary judgment and Plaintiff's response. Local Rule 7.1(D) of the Central District of Illinois states that "[a]ny filing not in compliance" with the requirements of the local rule on summary judgment motions "may be stricken by the court." Regarding motions for summary judgment, Rule 7.1(D)(1)(b) requires that the

movant "[l]ist and number each undisputed material fact which is the basis for the motion for summary judgment[,]" and that for each fact asserted, the movant is to "provide citations to the documentary evidence that supports it, appropriately referencing the exhibit and page."  Under Rule 7.1(D)(2)(b)(1), respondents to the motion for summary judgment must "[l]ist by number each fact from Section B of the motion for summary judgment which is conceded to be undisputed and material[,]" and, if the respondent disputes any of the movant's facts, Rule 7.1(D)(2)(b)(2) requires him to list by number each fact "which is conceded to be material but is claimed to be disputed," and further requires that "[e]ach claim of disputed fact must be supported by evidentiary documentation referenced by specific page."  Local Rules 7.1(D)(2)(b)(3), (4), and (5) contain similar requirements for disputed immaterial facts, undisputed immaterial facts, and additional facts.  Rule 7.1(D)(2)(b)(6) notes that "[a] failure to respond to any numbered facts will be deemed an admission of the fact."

Plaintiff has utterly failed to properly respond to Defendants' statement of undisputed material facts under the local rules.  Plaintiff's response is essentially a jumble of paragraphs mixing fact and argument.  He will state what appears to be a fact, and cite to his own exhibits attached to his response, and then follow that statement with argument.  Plaintiff nowhere lists any of Defendants' facts by number, and does not specifically refer to Defendants' facts and what he disputes about them. Therefore, pursuant to Rule 7.1(D)(2)(b)(6), the court deems all of Defendants' undisputed material facts to be admitted.  Further, the court finds Plaintiff's presentation of his additional facts to be improper, as he has not listed them in a

2

recognizable manner, has not distinguished the facts from argument, and has only sporadically cited to the record in support of his factual assertions.  This is a violation of Rule 7.1(D)(2)(b)(5).

Plaintiff claims that he is proceeding *pro se*, and this court has, up to this point, treated Plaintiff with the leniency usually accorded to *pro se* parties in federal court. *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008).  However, it is also well established that *pro se* litigants are not excused from compliance with procedural rules. *Pearle Vision*, 541 F.3d at 758.  Even *pro se* parties must comply with local rules in the absence of good cause.  *Garcia v. Illinois State Police*, 545 F.Supp.2d 823, 836 (C.D. Ill. 2015).  The court finds instructive the reasoning of this court's predecessor:

> Further, *pro se* litigants are presumed to have full knowledge of applicable court rules and procedures. Therefore, although the plaintiff is proceeding *pro se*, he must follow the Federal Rules and procedural rules of the Central District of Illinois. See *Metro Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002). The defendants are correct Local rules serve an important function in the summary judgment process. "Such rules assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a dispute fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 527, citing *Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999). The Seventh Circuit has consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment*." Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (upholding the district court's decision to strike response in its entirety rather than selectively due to failure to comply with local rules); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)(collecting cases).

*Moralis v. Flageole*, 2007 WL 2893652, at *3 (C.D. Ill. Sept. 28, 2007).

It should be further noted that Plaintiff's actual "*pro se*" status has been called into question in this case. Based on representations made by Plaintiff in his deposition, it appears he was being aided in this matter by an attorney, Jordan Hoffman, who helped him in his cases before the Illinois Department of Human Rights and Equal Employment Opportunity Commission. Therefore, it is questionable whether the court should provide Plaintiff the latitude traditionally given to *pro se* litigants. See *Thigpen v. Banas*, 2010 WL 520189, at *2 (N.D. Ill. Feb. 11, 2010) ("It would be unfair to afford [the plaintiff] leniency while allowing an undisclosed attorney to represent him in substance and not in form.").

In any event, all of Defendants' undisputed material facts are deemed admitted.

*Factual Background*

Plaintiff Morris Tyson, who is black, alleges that Defendants failed to accommodate his disability under the Americans with Disability Act (ADA), racially discriminated against him in violation of 42 U.S.C. § 1981, retaliated against him in violation of § 1981, and conspired against him in violation of 42 U.S.C. § 1985(3). Defendant Kenco Logistics is a third-party logistics company engaged in the business of transportation management, distribution, material handling, and related services. Defendants Kelvin Walsh, David Jabeley, Mario Lopez, and Mike Manzello are supervisors/managers for Kenco. On April 21, 2013, Kenco began performing logistics services for Defendant Mars, Inc., at Mars' warehouse located in Manteno, Illinois, pursuant to the terms of a written agreement with Mars. Kenco operated as an

independent contractor, providing warehouse management services at Mars' Manteno facility.  Under the terms of the agreement, Kenco had exclusive authority with respect to its employment policies, promotions, discipline, and termination.

On April 2, 2013, Kenco hired Plaintiff from the predecessor management company as a Yard Spotter (Spotter).  Plaintiff was assigned to work the first shift, as reflected in his offer letter from Kenco.  As a Spotter, Plaintiff's duties included driving yard tractors throughout the warehouse to move products, and parking and inspecting trailers.  Plaintiff's job description required a valid Commercial Driver's License (CDL), passage of a Department of Transportation (DOT) physical examination, and occasional lifting of up to 75 pounds.

Approximately one month after Plaintiff started working for Kenco, on or around May 20, 2013, he was in an accident outside of work and broke both of his wrists.  He remained off work for fifteen months, until August 26, 2014.  In accordance with Kenco's DOT policy and federal regulations (49 C.F.R. § 391.45 ), Spotters who sustain an injury that impacts their fitness for work are required to receive a new DOT medical clearance before they resume driving.

After the accident, Plaintiff was granted FMLA leave and was placed on a job-protected leave of absence for twelve weeks in accordance with Kenco's policy. Plaintiff's FMLA leave was exhausted on August 12, 2013, but he remained medically unable to return to work.  Following the expiration of the FMLA leave, Plaintiff submitted medical notes, in October and December 2013 and January 2014, placing him

5

off work.  He remained on approved medical leave of absence.

On February 24, 2014, Plaintiff's physician prepared an updated medical note to Kenco indicating Plaintiff could return to work with the following restrictions: "no lifting over 25 pounds and no forceful or repetitive activity with both hands."  Upon receiving notice that Plaintiff may be ready to return to work, Kenco's Benefits Department and Fleet Safety Department confirmed that he would have to retake a DOT physical examination before returning, and provided information to the Human Resources staff at the Manteno facility to convey information to Plaintiff about retaking the DOT physical examination whenever he felt ready to return to work.  Contrary to the medical paperwork received by Kenco, Plaintiff believes he could have passed the DOT exam and returned to work either in his role as a Spotter or to various other positions beginning as early as August 2013 or February 2014.

While Plaintiff was out on leave, another Spotter named Mark Baker suffered a work-related injury to his shoulder, and was off work for several months on worker's compensation.  When Baker returned, he performed the window clerk portion of Spotter duties for a period of time.  Kenco had one window clerk named Brenda Roth, but all other window clerk work was performed by Spotters, including Plaintiff.  This work consisted of data entry to generate shipping and receiving work for inbound and outbound logistics products.

On July 1, 2014, after failing to hear from Plaintiff that he had passed the DOT medical examination, Kenco mailed him a letter suggesting that his physician review

6

the job descriptions for Spotter and Warehouse Associate in order to determine whether he could return to either his position or an alternate position as an accommodation. On July 11, 2014, Plaintiff's physician signed and returned a medical statement to Kenco stating "waiting for a call from pt for final assessment. No work til pt calls us." On July 24, 2014, Plaintiff's physician released him to return to work with "some weight lifting and grip strength issues." Plaintiff submitted this note to Kenco and notified Kenco HR that he was ready to return as a Spotter, as he had seen a sign outside of Kenco indicating that Spotter positions were available. Several weeks later, on August 25, 2014, he passed the DOT exam and was cleared to return to work.

On August 26, 2014, Plaintiff returned to work at Kenco as a Spotter. Plaintiff claims Kelvin Walsh had previously told him that he had to be 100% healed in order to return to work. However, at his deposition Plaintiff agreed that he was returned to work prior to being 100% healed. Plaintiff also claims that he was a "floater" and did not have a set shift with fixed hours when he first returned to work as a Spotter. In September 2014, he complained to David Jabeley about being a floater rather than on his assigned shift and Jabeley told him he was arrogant. In response to Plaintiff's complaint to Jabeley, per Plaintiff's request, Plaintiff was assigned to a set shift with a scheduled start time of 5:00 a.m.

Plaintiff indicated that throughout his attempts to return to work following his injury, his communications were made entirely through the Kenco corporate and human resources scheme. Following his return in August 2014, Plaintiff had a

conversation with Mars Associate Robert Coffey, wherein Plaintiff told Coffey about the accident that caused his absence from work at the Manteno facility.  Prior to this conversation, Coffey had no knowledge as to why Plaintiff was absent from work, or Plaintiff's attempts to return to work.  At some point after his conversation with Coffey regarding his accident, Coffey was present when Plaintiff had an argument with Kenco supervisors Jabeley and Mario Lopez concerning his work hours and position in relation to his seniority.  Plaintiff did not raise any concern regarding race discrimination during this conversation.

Plaintiff never informed Mars of any perceived racial discrimination associated with his employment at the Manteno facility.  Neither Mars nor any Mars employee acted in any way to directly discriminate against Plaintiff based on his race.  Plaintiff acknowledged that, at all relevant times, "all matters regarding compensation, terms, conditions, rights and privileges of [his] employment were governed and controlled by Defendant Kenco."  Mars' control over the operations of the Manteno facility related to direction regarding the workload for the day and identification of the products to be brought in and shipped out.  Coffey did not have any direct effect on the actions that gave rise to Plaintiff's claims.  Kenco needed to obtain Mars' approval in advance if it wanted to be reimbursed for large amounts of overtime.

On September 22, 2014, Plaintiff filed a charge of discrimination with the Illinois Department of Human Resources (IDHR).  When he returned from medical leave, he learned that some Spotters had received wage increases while he was on leave.  Plaintiff

complained, and as a result his pay was increased to $18.50 an hour, the highest wage of any Spotter, and was retroactive to the day he returned to work.

Plaintiff claims Kenco retaliated against him by placing him off work for approximately four days while awaiting drug test results after he had an accident with a car that resulted in a broken mirror, but Plaintiff was paid for the entire period he was off work.

On January 27, 2015, all Manteno Kenco employees, including Plaintiff, were notified that Kenco had lost its contract to manage the Mars-Manteno warehouse. Plaintiff's last day of work at Kenco was February 28, 2015, and he (and all Kenco employees) were paid by Kenco for an additional month, through March 30, 2015.

Kenco had policies in place to prohibit discrimination and harassment, including requiring reasonable medical accommodations to qualified individuals.  Plaintiff does not challenge his termination from Kenco.  At no time during his employment at Kenco did Plaintiff ever hear a racially derogatory comment made by Kenco's managers. Plaintiff alleges conspiracy because he believes Jabeley and Mike Manzello were conspiring with other Kenco managers to get rid of him.

When Kenco lost its contract with Mars, Plaintiff was hired by Excel, the successor logistics company who took over managing the Manteno warehouse for Mars. Several months later, Excel terminated Plaintiff's employment because Excel could not reasonably accommodate his permanent medical restrictions - no lifting over 25 pounds and no repetitive activities with his left hand - in the Spotter position.  Plaintiff

9

continues to have issues with his left wrist, including not being able to make a fist.  He

is receiving social security disability benefits.  On March 21, 2016, he and his wife filed

for Chapter 7 Bankruptcy.

*Procedural Background*

Plaintiff filed his Amended Complaint (#51) on July 25, 2016.  Following this

court's Order (#80) of January 9, 2017, ruling on motions to dismiss, the following

claims survived to the summary judgment stage: (1) a claim under the Americans with

Disabilities Act (42 U.S.C. § 12101 et. seq.) against Kenco and the individual Defendants

that they failed to accommodate his injury and that he should have been returned to

work sooner than August 2014; (2) a claim of racial discrimination under 42 U.S.C. §

1981 against all Defendants in that his pay was reduced; and (3) a claim of conspiracy

under 42 U.S.C. § 1985(3) to deprive Plaintiff of the equal protection of the laws or the

privileges and immunities under the laws against all Defendants.

ANALYSIS

Defendants Kenco, Jabeley, Manzello, Walsh, and Lopez argue that their motion

for summary judgment should be granted because: (1) Kenco reasonably

accommodated Plaintiff's wrist injuries; (2) Plaintiff was not discriminated against

because of his race or retaliated against with respect to his hours, pay, or mandatory

drug test requirement; (3) Plaintiff has not properly alleged a conspiracy under §

1985(3); and (4) all of Plaintiff's claims are barred by judicial estoppel.

Defendant Mars argues that (1) it cannot be held liable for discrimination under §

1981 because it was not Plaintiff's employer and, even if joint employment is found, joint liability does not implicate liability for the actions of Plaintiff's other employer; (2) Plaintiff has failed to identify a protected right upon which he could recover against purely private actors under § 1985 in that (a) § 1981 cannot be the underlying basis for a right to be infringed by a § 1985 claim, and (b) neither Title VII race and sex claims, nor claims for discrimination under the ADA or ADEA provide an underlying basis for a right infringed by a § 1985 claim. Mars also argues that no Mars employee was involved in any conspiracy.

Plaintiff responds that Defendant Walsh refused to allow him to return to work in any capacity unless he was "100%" healed, in violation of the ADA, and that he was never reasonably accommodated, even though his doctor stipulated in February 2014 that back to work options should be discussed. Plaintiff also argues that he was discriminated against because Kenco advertised for and hired new Spotters while he was out on leave. Plaintiff believes Kenco had jobs available that he could have performed with or without accommodations. Plaintiff argues that a white employee named Mark Baker who was injured had accommodations made for him that were not made for Plaintiff. Finally, Plaintiff argues that he was paid disproportionately to other non-black Spotters, who did not even meet the minimum requirements of having a CDL.

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture.  See *Singer*, 593 F.3d at 533.  In addition, this court "need not accept as true a plaintiff's characterization of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings.  *Waldridge*, 24 F.3d at 920.  "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal."  *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).  Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th

Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

*Plaintiff's Response*

Before engaging in analysis of Defendants' arguments, the court must address Plaintiff's Response (#108) and the requirements under the Local Rules. Central District of Illinois Local Rule 7.1(D)(2)(c) states that "[w]ith or without additional citations to authorities, [a response must] respond directly to the argument in the motion for summary judgment, for example, by explaining any disagreement with the movant's explanation of each point of law, why a point of law does not apply to the undisputed material facts, why its application does not entitle the movant to relief or why, for other reasons, summary judgment should not be granted."

Plaintiff has cited to no legal authority in support of any specific argument in his Response. In addition, Plaintiff has not organized his Response in any coherent manner. It is not exactly clear what specific arguments made by Defendants he is responding to, and indeed he has completely failed, in some instances, to respond to Defendants' arguments at all. For example, there is nothing in his Response responding to any of Defendant Mars' arguments, nor does he make any argument that Mars should be liable for his claims. Another example is that Plaintiff has failed to respond in any way to Defendant Kenco's judicial estoppel argument. However, a nonmovant's

13

failure to respond to a summary judgment motion, or failure to comply with local rules, does not, of course, automatically result in judgment for the movant, as the ultimate burden of persuasion remains with Defendants to show that they are entitled to judgment as a matter of law. See *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). Therefore, this court must evaluate Defendants' arguments to determine if they are entitled to judgment as a matter of law.

*Disability*

Plaintiff alleges that Defendants failed to reasonably accommodate him when he suffered injuries to both wrists and desired to return to work, in violation of the ADA. Defendants argue that the facts establish that Plaintiff could not perform the essential functions of the Spotter position until he returned to work in August 2014, and further that they reasonably accommodated Plaintiff by continuing his employment by providing him with an unpaid fifteen month leave of absence.

The ADA makes it unlawful for an employer to discriminate against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

The court will first address whether Defendants violated the ADA by not returning Plaintiff to work at his Spotter position prior to August 2014. Under the definition of qualified individual, the undisputed material facts in Defendants' motion,

14

now deemed admitted due to Plaintiff's inadequate response, establish that Plaintiff could not have returned to work at his Spotter position prior to August 2014 because he could not perform the essential functions of that position.  Plaintiff provided doctor's notes from May 2013 through January 2014 indicating that he could not work due to an out of work accident where he broke both wrists, and Plaintiff remained on medical leave.  In February 2014, his doctor provided an updated medical note indicating that he could return to work with certain restrictions, such as no lifting anything over 25 pounds and no forceful or repetitive activity with both hands.  The Spotter job, however, involved heavy lifting and frequent activities with his hands, such as driving. Upon receiving this note, Kenco's Benefits Department and Fleet Safety Department confirmed that Plaintiff would have to retake a DOT physical examination before returning.  Plaintiff never took the DOT physical exam between February and August 2014.[1]  Once Plaintiff passed the DOT exam on August 25, 2014, he was immediately cleared to return to work as a Spotter, and indeed returned to work the very next day.

---

[1]Plaintiff appears to argue he was never informed about the need to pass the DOT medical exam until July 2014, however the affidavit of Kenco's Benefits Manager, Cathy Phillips, indicates that in February 2014 it was determined that Plaintiff could not return to work as a Spotter until he passed the exam, and that this information, and the necessary paperwork, was communicated to Kenco Human Resources Manteno clerk Edith McCurry.  The email communications make clear that Plaintiff, at the very least, was aware of the DOT physical requirement and knew he had to pass it.  McCurry stated she would pass on to Plaintiff all the forms and information he needed to take the physical.  McCurry, incidentally, is a plaintiff in another lawsuit against Kenco and Mars that was filed around the same time, and is of a similar flavor to, Plaintiff's instant lawsuit. It should be noted that at least four lawsuits by former Kenco employees were filed in late 2015 against the same Defendants, making similar allegations of discrimination in various forms.

15

Defendant Kenco, as an employer, was entitled to rely on Plaintiff's failure to obtain certification in refusing to allow him to resume his employment as a Spotter, and Defendants may assert Plaintiff's lack of certification as a valid defense to Plaintiff's ADA claim. See *Bay v. Cassens Transport Co.*, 212 F.3d 969, 975 (7th Cir. 2000). Thus, the undisputed facts establish that, because Plaintiff had not taken and passed the DOT exam before August 2014, Defendants did not violate the ADA by failing to return Plaintiff to his job as a Spotter.

The court next turns to Plaintiff's claim that Defendants failed to accommodate him in violation of the ADA. "In order to establish a claim for failure to accommodate, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of [his] disability; and (3) the employer failed to reasonably accommodate the disability." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014).

Defendants argue that summary judgment should be entered in their favor on this claim because (1) they afforded Plaintiff a nearly fifteen month period of unpaid leave of absence and (2) they inquired about accommodating him with another position (Warehouse Associate) if he was unable to work as a Spotter. Defendants also reject any assertion by Plaintiff that the ADA was violated when Defendants accommodated a fellow injured employee, Mark Baker, by moving Baker to a mail clerk position, but declined to move Plaintiff to the same position.

An employee's request for an accommodation requires the employer to engage in

16

a flexible, interactive process to identify a reasonable accommodation.  *Basden v. Professional Transportation, Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2014).  Here, Defendants allowed Plaintiff to have fifteen months of unpaid leave without termination, despite Plaintiff submitting doctor's notes indicating inability to return to work through February 2014.  Once Defendants received the February 2014 note, they attempted to begin the process of getting Plaintiff to take the DOT exam so he could return to work as a Spotter, but Plaintiff did not take the exam until August 2014.  In the meantime, on July 1, 2014, while Plaintiff was still on leave, and after failing to hear from Plaintiff on whether he had taken the DOT exam, Defendant Kenco mailed a letter to Plaintiff suggesting that his physician review the job descriptions for Spotter and Warehouse Associate in order to determine whether Plaintiff could return to his old Spotter job, or whether an accommodation could be made for an alternative position.

Such actions on the part of Defendants indicate that they engaged in a process to identify a reasonable accommodation for Plaintiff.  See *Coffey-Sears v. Lyons Township High School Dist. 204*, 2017 WL 1208439, at *9-10 (N.D. Ill. Mar. 31, 2017) (once paid leave is exhausted, permitting the use of unpaid leave is a form of reasonable accommodation when necessitated by an employee's disability); *Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) (employers may reasonably accommodate disabled/injured employees by offering alternative position which can accommodate injuries).  The employer will only be liable "if it bears the responsibility for the breakdown in the interactive process."  *Felix v. Wisconsin Department of Transportation*, 104 F.Supp.3d 945,

956 (E.D. Wisc. 2016), quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). In determining who caused the interactive process to break down, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary, and a party that fails to communicate, by way of initiation or response, may also be acting in bad faith. *Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Here, Plaintiff, did not engage in reciprocal interaction on a reasonable accommodation, as is his responsibility under the reasonable accommodation framework. Plaintiff has also provided no competent evidence, as he must at this stage of the litigation, that Defendants acted in bad faith in any way. Based on the undisputed material facts, Plaintiff bears the responsibility for the breakdown in the interactive process, and thus Defendants cannot be held liable under the ADA for failure to reasonably accommodate Plaintiff.

Further, Plaintiff's argument that he should have been assigned to a window clerk position, like another fellow employee who was injured, is similarly unavailing. First, an employer is obligated to provide a qualified individual with a reasonable accommodation, *not* the accommodation he would prefer. *Rehling*, 207 F.3d at 1014. Second, up until a few weeks before he returned to work in August 2014, Plaintiff, per his doctor's notes, could not perform repetitive activities with his wrists. Window clerk duties consisted of data entry on computers, work that most definitely requires the free and repetitive use of one's wrists. Defendants did not fail to reasonably accommodate

Plaintiff under the ADA.

*Discrimination Under § 1981 With Respect to Plaintiff's Hours, Pay, or Mandatory Drug Test*

Plaintiff alleges that he was discriminated against on the basis of his race by Defendants when: (1) they accommodated a similarly-injured white employee, Mark Baker, with window clerk duties and light Spotter duty; (2) they retaliated against him after he returned to work when he was (a) placed off work for three days following a drug test; (b) was returned to work as a floater without an assigned shift; and (c) was paid less than other Spotters.

The Seventh Circuit has written, on racial discrimination claims under § 1981:

"The legal analysis for discrimination claims under Title VII and § 1981 is identical, so we merge our discussion of the two claims." *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015). Last year we overruled a line of our cases separating discrimination claims into "direct" and "indirect" categories and assigning different legal standards to each. See *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016). We clarified in *Ortiz* that all discrimination cases present the same basic legal inquiry: At the summary-judgment stage, the proper question to ask is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action." *Id.* at 765.

Nothing in *Ortiz*, however, displaced the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which is sometimes referred to as the "indirect" method of proof. 834 F.3d at 766. (It's not our prerogative to displace a decision method established by the Supreme Court.) The *McDonnell Douglas* framework is just "a formal way of analyzing a discrimination

case when a certain kind of circumstantial evidence—evidence that similarly situated employees not in the plaintiff's protected class were treated better—would permit a jury to infer discriminatory intent." *Smith*, 806 F.3d at 905.

*Ferrill v. Oak-Creek Franklin Joint School Dist.*, 860 F.3d 494, 499-500 (7th Cir. 2017).

Plaintiff does not point to any racially charged or discriminatory statements, policies, or actions made by Defendants, but rather relies on how similarly situated white employees were better accommodated when he was not, nor were they subjected to retaliation in the form of mandatory drug test, reduction in hours, or reduction in pay. Such allegations are better analyzed under the *McDonnell-Douglas* burden shifting method, which is a permissible analysis even after *Ortiz*. *Ferrill*, 860 F.3d at 499-500. Under this approach, Plaintiff carries the burden of production on a four-part prima facie case, and must show that (1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment. *Ferrill*, 860 F.3d at 500. If Plaintiff makes this prima facie showing, the burden shifts to Defendants to come forward with a legitimate, nondiscriminatory reason for the challenged employment action and, if Defendants do this, then the burden shifts back to Plaintiff to produce evidence establishing a genuine dispute of fact about whether Defendants' reason was a pretext for discrimination. *Ferrill*, 860 F.3d at 500. "Pretext" is more than a mere mistake; it "means a lie"—a "phony reason" for the employment action. *Ferrill*, 860 F.3d at 500.

Plaintiff claims that Defendants' failure to accommodate him with a window clerk position, while fellow injured white employee Mark Baker was given such a position, was discrimination. That argument must fail. Plaintiff cannot carry his burden to make a prima facie case, which he must do with competent evidence. First, Plaintiff cannot show that he could perform that job to his employer's expectations because, as noted by the court earlier, the window clerk position involved computer data entry, which involves extensive use of one's wrists in a repetitive manner, and Plaintiff's doctor's notes indicated he could not do repetitive work involving his wrists. Second, Plaintiff cannot show that Mark Baker was "similarly situated" to himself. Unlike Plaintiff, who had broken both his wrists and could not use them, Baker suffered a rotator cuff injury, an injury of the shoulder markedly different from Plaintiff's injury. Baker's injury did not impair his wrists and working on data entry. Thus, because Plaintiff cannot make the prima facie case, his claim on discrimination due to failure to accommodate must fail.

Next, Plaintiff cannot make a prima facie case that he suffered an "adverse employment action" with regard to being placed off work for three days (for which Plaintiff was paid) following a mandatory drug test, or for being returned to work as a "floater" without an assigned shift. Not everything that makes an employee unhappy is an adverse employment action under § 1981 or Title VII. *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007). A materially adverse employment action is something that is more disruptive than a mere inconvenience or

an alteration of job responsibilities, because "[o]therwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Nichols*, 510 F.3d at 780. The Seventh Circuit has identified three types of general categories of actionable, materially adverse employment actions: (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment. *Nichols*, 510 F.3d at 780. Giving Plaintiff three or four days of paid leave following a mandatory drug test due to Plaintiff having an accident at work with a car where a side mirror was broken off does not fall under any of the three categories articulated in *Nichols*, but rather appears to fit under the "mere inconvenience or an alteration of job responsibilities" rubric that *Nichols* found would not constitute racial discrimination.

Likewise for Defendants initially assigning Plaintiff to be a "floater" upon his return, rather than giving him his old set shift hours. As noted by Defendants, an employer's changing an employee's ability to work a particular schedule, absent

evidence that such a change materially altered the terms or conditions of employment, generally does not constitute an adverse employment action. *Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012); see also *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir.2001) (rejecting the plaintiff's constructive discharge claim and observing that "[the employer's] decision to change [the plaintiff's] working hours certainly does not rise to the level of an adverse employment action" because the plaintiff's "pay and job title remained the same, and she suffered no significantly diminished job responsibilities"). Plaintiff has not provided competent evidence demonstrating that the change in schedule "materially altered the terms or conditions of his employment," and, in any event, he was soon assigned to a set schedule after he complained about the change.

Finally, with respect to Plaintiff's reduction in pay argument, that too must fail. The undisputed evidence demonstrates that Plaintiff learned that some Spotters had received wage increases while he was on medical leave, that Plaintiff complained, and that as a result, his pay was increased to $18.50 an hour, the highest wage of any Spotter, and was made retroactive to the date he returned to work. Plaintiff has thus suffered no harm, and this cannot be considered an "adverse employment action." Thus, Plaintiff's § 1981 discrimination claims must fail.

*Conspiracy Under § 1985*

Plaintiff claims that Defendants engaged in a conspiracy under § 1985(3) to get him fired from Kenco. Specifically, Plaintiff believes Defendants Jabeley and Manzello were communicating with each other and other Kenco managers regarding the best

way to terminate Plaintiff's employment.  In order to state a claim under § 1985(3), a plaintiff must demonstrate (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens.  *Hernandez v. Joliet Police Department*, 197 F.3d 256, 263 (7th Cir. 1999).   The plaintiff also must show some racial, or otherwise class-based, invidiously discriminatory animus behind the conspirators' actions, and that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment.  *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002).  To establish the existence of a conspiracy, a plaintiff must show that the conspirators agreed to inflict injury upon him; in other words, that they acted with a single plan, the general nature and scope of which was known to each conspirator.  *Green*, 281 F.3d at 665. Agreement may be inferred from circumstantial evidence, but only if it is sufficient to permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives.  *Green*, 281 F.3d at 665-66.

Here, Plaintiff has failed to demonstrate that some racially discriminatory animus lay behind the alleged conspirators' actions, and the "conspiracy" aimed at interfering with rights protected against private encroachment.  Again, surviving summary judgment requires Plaintiff to present definite, competent evidence in rebuttal.  *Butts*, 387 F.3d at 924.  Plaintiff cannot simply rely on the allegations contained

24

in the pleadings or conjecture and innuendo.  *Waldridge*, 24 F.3d at 920; *Singer*, 593 F.3d at 533.  Plaintiff has provided no evidence of any racial animus on the part of Jabeley or Manzello, or any tangible actions in furtherance of a conspiracy to get him fired on racial grounds.  Rather, the undisputed material facts demonstrate that Plaintiff was terminated from Kenco when the contract with Mars ended and *all* Manteno Kenco employees were terminated.  Plaintiff's § 1985 conspiracy claim must fail.  Judgment is entered for Defendants Kenco, Jabeley, Manzello, Walsh and Lopez on all of Plaintiff's claims.

*Claims Against Defendant Mars*

Plaintiff's §§ 1981 and 1985 claims against Mars fail for the same reasons those claims failed against the Kenco Defendants.  The court has already determined that Plaintiff has presented no evidence of racial discrimination under §§ 1981 and 1985 against the Kenco Defendants.  Likewise, Plaintiff, in his Response, fails to make any sort of argument or even mention Mars' complicity or relevance to his claims.  Further, the undisputed material facts establish that (1) Plaintiff never informed Mars of any perceived racial discrimination associated with employment at the Manteno facility; (2) neither Mars nor any Mars employee acted in any way to directly discriminate against Plaintiff based on his race; (3) Plaintiff acknowledged that, at all relevant times, "all matters regarding compensation, terms, conditions, rights and privileges of [his] employment were governed and controlled by Defendant Kenco"; and (4) Mars' control over the operations of the Manteno facility related to direction regarding the workload

for the day and identification of the products to be brought in and shipped out and that Mars' representative Coffey did not have any direct effect on the actions that gave rise to Plaintiff's claims.  Under these facts, Plaintiff cannot make any claim for racial discrimination against Mars under §§ 1981 or 1985.  Judgment is entered for Mars on Plaintiff's claims.

IT IS THEREFORE ORDERED:

(1)     Defendants' Motions for Summary Judgment (#103), (#104) are both GRANTED in full.  Judgment is entered in favor of Defendants and against Plaintiff.  The final pretrial date of December 15, 2017, and jury trial date of January 16, 2018, are hereby VACATED.

(2)     This case is terminated.


ENTERED this 16th day of October, 2017.


s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE

26